UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT and ST. PAUL
FIRE & MARINE INSURANCE
COMPANY,

                Plaintiffs,

v.                                       Case No:   2:13-cv-670-FtM-38CM

ATTORNEY'S TITLE INSURANCE
FUND, INC., FLORIDA TITLE CO.,
SECTION 10 JOINT VENTURE,
LLP, SKY PROPERTY VENTURE,
LLC, and CAS GROUP, INC.,

                Defendants.

_____/

## <u>ORDER</u>[1]

      This matter comes before the Court on Plaintiffs Travelers Indemnity Company of

Connecticut and St. Paul Fire & Marine Insurance Company's Motion for Final Summary

Judgment (Doc. #353) filed on April 4, 2016.  Defendant Section 10 Joint Venture, LLP

filed a Response in Opposition (Doc. #385) on April 25, 2016, in which Defendants Sky

Property Venture, LLC, CAS Group, Inc., Attorneys' Title Insurance Fund, Inc., and

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites.  Likewise, the Court has no agreements with any of these third parties or their websites.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

Florida Title Co.[2] joined (Doc. #375; Doc. #397).  Additionally, the Court entertained oral argument on May 24, 2016.  The matter is ripe for review.

**Undisputed Material Facts**[3]

This case derives from a real estate fraud scheme that resulted in years of state court litigation between the Defendants to this action.  Eventually, the Defendants resolved that state court litigation by entering into a *Coblentz*[4] agreement, which relieved ATIF from any liability and shifted that liability to ATIF's insurance providers.  At issue in this action is whether the Plaintiffs, Travelers and St. Paul, two of ATIF's insurance providers, are liable for the full, or a partial, amount of that agreement.  Plaintiffs argue that they are not, and have filed this action to seek a declaratory judgment from the Court specifying as much.

To place this case in context, the Court must first discuss the underlying state court litigation.  That litigation began when ATIF sued Section 10 Joint Venture LLP, Sky Property Venture LLC, and CAS Group, Inc. to recover $3 million that it had to pay as the title insurer for fraudulently sold property.  The basis for that action was a belief that the sellers who orchestrated the fraud reinvested their proceeds in a property owned by Section 10 ("the Property").  ATIF asserted three claims: equitable lien/constructive trust, injunctive relief, and unjust enrichment ("ATIF Lawsuit").  To ensure potential buyers of the Property were aware of the ongoing litigation, ATIF recorded a *lis pendens*.  Section

---

[2] Defendants Attorneys' Title Insurance Fund, Inc. and Florida Title Co. are collectively hereinafter referred to as ATIF.

[3] These facts come from Plaintiffs Travelers Indemnity Company and St. Paul Fire & Marine Insurance Company's Statement of Material Facts (Doc. #353 at 4-34), which Defendant Section 10 Joint Venture, LLP did not dispute.  (Doc. #385 at 3-14).

[4] *Coblentz v. Am. Sur. Co. of New York,* 416 F.2d 1059 (5th Cir. 1969).

2

10 counterclaimed for slander of title, wrongful *lis pendens*, declaratory judgment, tortious interference, and wrongful injunction ("2008 Counterclaim").

In addition to the counterclaims, Section 10 also secured an order from the state court requiring ATIF to post a bond if it wished to maintain the *lis pendens*. ATIF never responded to the court's order, but the court never dissolved the *lis pendens* either. After ATIF ignored two more state court orders requiring a bond, the court eventually discharged the *lis pendens*. Nearly three years later, Section 10 retained new counsel and filed amended counterclaims for slander of title and tortious interference ("2011 Counterclaim"). Ten months later, Section 10 filed a motion for leave to file a second amended counterclaim, alleging that, because of ATIF's "wrongful filing, recording, and maintaining" of the *lis pendens*, Section 10 suffered a $42.68 million loss in the Property's value from the time ATIF instituted the *lis pendens* to when the state court ultimately discharged it.

ATIF did not oppose the motion for leave and agreed to allow Section 10 to file the second amended counterclaim, which asserted one claim for slander of title based on the *lis pendens*. Shortly thereafter, Section 10 lost the Property to foreclosure. ATIF responded by agreeing to dismiss its equitable lien/constructive trust and injunctive relief claims, leaving only its claim for unjust enrichment. ATIF also moved to dismiss the second amended counterclaim and moved for summary judgment on that counterclaim. Section 10 responded by filing another motion for leave to file a third amended counterclaim. The court granted ATIF's motion to dismiss with prejudice, leaving only ATIF's single unjust enrichment claim. Section 10 then renewed its motion for leave to file the third amended counterclaim. The court again denied that motion, but noted that

Section 10 may pursue its malicious prosecution claim in a separate action after the ATIF Lawsuit was resolved.  Unsatisfied, Section 10 filed an amended motion for leave to file the third amended counterclaim and a new action against ATIF for malicious prosecution ("Malicious Prosecution Action").

During this same period, ATIF and Section 10 attended non-binding arbitration and mediation.  Those events resulted in ATIF allowing Section 10 to file its third amended counterclaim and joining in a request that the ATIF Lawsuit and the Malicious Prosecution Action be consolidated into one action.  The court granted their request and consolidated the cases, which consisted of ATIF's unjust enrichment claim against Section 10 and Section 10's slander of title and malicious prosecution claims against ATIF ("Consolidated Action").

Against that backdrop, the Court turns now to Plaintiffs' role in the instant litigation. From 2007 to 2012, Plaintiffs insured ATIF with a commercial general liability policy and a commercial umbrella liability policy.[5]  In June 2013, ATIF submitted Section 10's motion for leave to file the third amended counterclaim and a copy of the counterclaim to Plaintiffs for a coverage evaluation.  Over the next two months, Plaintiffs questioned ATIF about the motion and proposed counterclaim, but ATIF provided only limited information, alleging the information was confidential based on Florida's Mediation Privilege Statute. At the end of July, ATIF tried once again to gain coverage by submitting the Malicious Prosecution Action complaint to Plaintiffs.  In doing so, ATIF alerted Plaintiffs that it "understood an order was likely to be entered permitted other claims . . . as counterclaims."  Two days later, the court entered an order allowing Section 10 to file the

---

[5] Travelers issued the general liability policy and St. Paul issued the umbrella liability policy.

third amended counterclaim.  ATIF forwarded a copy to Plaintiffs and asked them to consider the now live third amended counterclaim in its coverage decision.

In early September, Plaintiffs issued their coverage decision for both the Malicious Prosecution Action claim and the 2013 Counterclaim, agreeing to defend ATIF subject to a reservation of rights.  Plaintiffs reserved their right "to initiate a declaratory judgment action to determine the scope of its obligations . . . and - if appropriate under applicable law – to withdraw from the defense . . . and/or to seek recoupment of attorneys' fee [sic] and other litigation expenses."  One week later, ATIF and Section 10 agreed in principal to the *Coblentz* agreement and ATIF rejected Plaintiffs' offer of a defense subject to a reservation of rights.  Hours later, ATIF and Section 10 "executed" the *Coblentz* agreement.  Under that agreement, ATIF agreed to a consent judgment in Section 10's favor on all pending claims set forth in the Consolidated Action with damages totaling roughly $40 million.  Due to nature of the *Coblentz* agreement, however, Section 10 could only enforce this judgment against ATIF's insurers.  To assist Section 10 in this task, ATIF assigned all of its rights under the policies to Section 10.

With Section 10 now seeking to enforce the *Coblentz* agreement against them, Plaintiffs seeks summary judgment in its favor on the basis that there is no coverage under its policies for any of the claims presented.

### Legal Standard

An award of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To that end, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In determining whether summary judgment is appropriate, the Court evaluates the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). All evidence, and factual inferences reasonable drawn from that evidence, must be viewed in the light most favorable to the nonmoving party. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citations omitted). And all reasonable doubts about the facts must be resolved in favor of the non-movant too. *See id.* For it is not the Court's task to "weigh the evidence and determine the truth of the matter," but rather to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## Discussion

To enforce the *Coblentz* agreement against Plaintiffs, Section 10 must prove three elements: (1) Plaintiffs wrongfully refused to defend ATIF in the underlying state court litigation; (2) Plaintiffs had a duty under the insurance policies to indemnify ATIF; and (3) the settlement between ATIF and Section 10 was reasonable and made in good faith. *See Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1322 (11th Cir. 2014) (applying Florida law). Plaintiffs present several arguments for why Section 10 cannot establish these elements and why summary judgment in their favor is proper. The Court will address each element in turn.

**1. Whether Plaintiffs Wrongfully Refused to Defend ATIF**

Plaintiffs argue that Section 10 cannot establish that they wrongfully refused to defend ATIF in the underlying state court litigation.  (Doc. #353 at 34-35).  In support, Plaintiffs note that "the Court has previously held that '[they] did not breach their duty to defend by offering to defend only under a reservation of rights.'"  (Doc. #353 at 34). Plaintiffs then equate this holding to the Court confirming that they did not wrongfully refuse to defend ATIF.  (Doc. #353 at 34-35).  This argument misses the mark.

It is well-established that an insurer does not breach the duty to defend by offering to defend subject to a reservation of rights.  *See Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1149 (11th Cir. 2010) ("[A]n insurer may reserve its right to challenge coverage under the policy without breaching its duty to defend by providing a defense under a reservation of rights.").  Therefore, the Court stands by its previous holding that Plaintiffs did not breach their duty by offering to defend ATIF in the state court litigation under a reservation of rights.  That said, the Court is not aware of any binding case law, and Plaintiffs have failed to provide any, holding that the duty to defend is synonymous with the wrongfully-refusing-to-defend *Coblentz* element.  Nor is the Court inclined to pioneer such a holding at this time.  Without a single citation to binding case law supporting this argument, or a single citation to the record other than the Court's previous order, there is an issue of material fact regarding whether Plaintiffs wrongfully refused to defend ATIF in the state court litigation.

**2. Whether Plaintiffs had a Duty to Indemnify ATIF**

Turning to the second element necessary to enforce the *Coblentz* agreement, Plaintiffs argue that Section 10's claims against ATIF are not covered under the policies,

and therefore they did not have a duty to indemnify ATIF.  More specifically, Plaintiffs argue that the claims against ATIF are excluded from coverage because (1) they arose out of ATIF's handling of title claims and (2) ATIF breached the policies' cooperation clause.

Florida law provides that insurance contracts should be construed according to their plain meaning.  *See Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007).  It also provides that insurance contracts should "be construed or interpreted so as to give effect to the intention of the parties to be determined by the instrument as a whole."  *Franklin Life Ins. Co. v. Tharpe*, 178 So. 300, 302 (Fla. 1938).  This requires that courts "construe each sentence with other provisions of the policy to arrive at a reasonable construction that accomplishes the intended purpose of the parties."  *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1456 (11th Cir. 1989) (citation omitted).  It is assumed that the parties intended each provision to be relevant, so courts "must avoid a construction that does not give all portions of the policy meaning and effect."  *Id.* (citations omitted).

*A.  Financial Services Exclusion/Insurance Company Exclusion*

Both the Travelers and St. Paul policies[6] exclude coverage for claims relating to the handling of insurance claims.  To be exact, the Travelers policy excludes claims "arising out of the rendering of or the failure to render financial services by any insured to others."  (Doc. #37-7 at 42).  It defines "financial services" as "[w]ith respect to any contract . . . of insurance: [i]nvestigating, defending, handling, adjusting, or settling any claim or 'suit.'" (Doc. #37-7 at 42).  The St. Paul policy similarly excludes coverage for any injury "arising out of the rendering of, or failure to render, any professional service by

---

[6] As noted above, Travelers issued the commercial general liability policy, while St. Paul issued the umbrella liability policy.

or on behalf of an [i]nsured, including . . . the handling of any insurance . . . claims or losses." (Doc. #37-13 at 43).

Plaintiffs aver that these exclusions bar coverage for Section 10's claims against ATIF. (Doc. #353 at 39-42). The primary support for this argument is the deposition testimony of the ATIF corporate representative, Ford MacConnell. (Doc. #291 at 13-14). When questioned whether "claims handling" involves efforts to recover monies paid on claims, MacConnell answered affirmatively that it can. (Doc. #291 at 13-14). He also testified that "[i]n situations where there is also salvage available on a claim, the claims attorney or paralegal handling the claim would also become involved in that activity." (Doc. #291 at 14). Plaintiffs aver this testimony illustrates that salvage actions, such as the ATIF Lawsuit, are part of the claims handling process. (Doc. #353 at 39-42). And, as part of that process, Section 10's claims against ATIF, which derive from the ATIF Lawsuit, are excluded from coverage. (Doc. #353 at 39-42).

Section 10 disagrees. It contends that Plaintiffs' argument "impermissibly requires a broad interpretation of the exclusionary language." (Doc. #385 at 23-26). If the policies excluded salvage or recovery activities, Section 10 argues, then these terms would have been enumerated in the exclusions or included in the definition of "claim handling." (Doc. #385 at 23-26). Section 10 also argues that Plaintiffs ignore key limiting language contained in the Travelers policy exclusion.[7] (Doc. #385 at 23-26). According to Section 10, that language limits the exclusion to financial services provided "to others," illustrating the exclusion is inapplicable to situations such as this, where the insurer is seeking to

---

[7] The St. Paul policy does not contain similar language, therefore, this argument is applicable to only the Travelers policy.

recover monies for its sole benefit and not for its insureds or anyone else.  (Doc. #385 at 23-26).

The Court finds Plaintiffs' argument persuasive.  In both policies, the language is clear and unambiguous:  claims related to the handling of insurance claims are excluded from coverage.  While the parties disagree whether salvage activity is woven into the claims handling tapestry, the undisputed material facts show that, in this instance, it is.  The Court needs to look no further than MacConnell's deposition testimony to confirm this.  Section 10's only response to that testimony is the deposition testimony of Matthew Lucas, an attorney who helped represent ATIF in the ATIF Lawsuit.  (Doc. #380-1).  Lucas testified that *he* would not consider the ATIF Lawsuit claims work based on the documents he reviewed during the deposition.  (Doc. #380-1 at 5-8).  Contrary to MacConnell, who testified on behalf of ATIF, Lucas's testimony constitutes nothing more than an opinion of how *he* would classify the ATIF Lawsuit.  Section 10 fails to offer any evidence that illustrates ATIF does not consider salvage activity to be part of the claims handling process.  Absent such evidence, the undisputed factual record shows the Section 10 claims asserted against ATIF arose from the handling of insurance claims.  Consequently, the Financial Services Exclusion and the Insurance Company Exclusion bar coverage for these claims.

B.  *Cooperation Clause*

Both insurance policies also require the insured's full cooperation.  The Travelers policy demands that the insured "[c]ooperate with [Travelers] in the investigation or settlement of the claim or defense against the 'suit.'"  (Doc. #37-7 at 16).  Likewise, the St. Paul policy demands that the insured "cooperate with [St. Paul] in the investigation,

settlement, or defense of any claim or suit we investigate, settle, or defend." (Doc. #37-13 at 32).  The St. Paul policy also requires the insured to "immediately send [St. Paul] copies of any demands . . . received in connection with the claim or suit."  (Doc. #37-13 at 32).  Plaintiffs argue ATIF breached these explicit requirements in the months leading up to the *Coblentz* agreement, thereby illustrating a failure to cooperate.

First, "ATIF repeatedly failed and refused to disclose to [Plaintiffs] the status of its settlement negotiations with Section 10, even going so far as to purposely mislead [them]." (Doc. #353 at 44).  Second, "ATIF affirmatively assisted Section 10 to file claims against it so that ATIF could tender those claims to [Plaintiffs] for coverage."  (Doc. #353 at 45).  This includes "abandon[ing] its opposition to Section 10's motion to amend to assert counterclaims, accept[ing] service of Section 10's malicious prosecution lawsuit, and agree[ing] to consolidation of the two actions, thereby allowing Section 10 to accomplish exactly what the [state court] had ordered Section 10 not to do – file its malicious prosecution claim before ATIF's still-pending lawsuit against Section 10 was concluded." (Doc. #353 at 45).  Third, "ATIF failed to disclose to [Plaintiffs] that it received settlement demands from Section 10," including Section 10's April 2013 mediation demand.  (Doc. #353 at 45).

Section 10 responds that ATIF never accepted Plaintiffs' offer of a defense subject to a reservation of rights, and therefore it had no duty to cooperate with them.  (Doc. #385 at 26-27).  Yet, even if the duty to cooperate was triggered, Section 10 avers that the undisputed material facts show that ATIF met its duty by continuing to inform Plaintiffs about the Section 10 claims against it.  (Doc. #385 at 27-28).  This includes informing Plaintiffs about the proposed 2013 Counterclaim and Malicious Prosecution Action.  (Doc.

#385 at 27-28).  Section 10 also argues that the undisputed facts show that Plaintiffs failed to use reasonable efforts to bring about ATIF's cooperation and that Plaintiffs were not substantially prejudiced by any alleged breach of the duty to cooperate.  (Doc. #385 at 28-29).  Finally, Section 10 avers that the Florida Claims Administration Statute and the Florida Mediation Privilege Statute prevent Plaintiffs from achieving summary judgment on this issue.  (Doc. #368 at 31-33).

Florida law does not allow an insurer to escape liability each time an insured fails to cooperate.  *See Ramos v. Northwestern Mut. Ins. Co.*, 336 So. 2d 71, 75 (Fla. 1976).  Rather, to constitute a breach of the policy, the insurer must show that "the lack of cooperation was material" and that "it was substantially prejudiced in the particular case by failure to cooperate."  *Id.*  The insurer must also show that it "exercised diligence and good faith in bringing about the cooperation of its insured" and that it "complied in good faith with the terms of the policy."  *Id.*  Determining whether an insurer has met these burdens is ordinarily a question of fact.  *Id.*  But, where the facts are admitted, it can be a question of law.  *Id.*

The cooperation issue here is unique.  Unlike other *Coblentz* actions, ATIF never accepted Plaintiffs' offer of a defense subject to a reservation of rights.  *Cf. Cont'l Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 692 (11th Cir. 2008) (finding breach of cooperation clause where insured accepted insurer's offer of a defense subject to a reservation of rights and unilaterally settled action).  At the same time, however, the Court is not aware of any action where an insured and claimant worked in such methodical detail to bring about a "live" claim in order to shift liability to an insurer.  From Plaintiffs' perspective, it appeared as though Section 10 succeeded in renewing its claims against

ATIF, and ATIF requested a coverage decision for those renewed claims.  In reality, ATIF became worried that it would face scrutiny from insurance regulators and sought the easiest method of terminating the state court litigation without facing any liability.

The record is replete with emails, handwritten notes, and phone call summaries showing ATIF and Section 10 colluded for months to figure out the best way to secure coverage for Section 10's claims, at least one of which was not ripe.  Unbeknown to Plaintiffs, ATIF and Section 10 began settlement negotiations in May 2013.  (Doc. #290 at 162).  At that time, the state court had dismissed Section 10's counterclaims and denied its motion for leave to file amended counterclaims, leaving only ATIF's unjust enrichment claim standing.  (Doc. #277 at 88-90, 194-95).  Nevertheless, ATIF nervously faced meetings with insurance regulators in the coming months and believed Section 10 would bring a separate action for malicious prosecution once the unjust enrichment claim was resolved.  *See* (Doc. #297 at 29 (explaining ATIF's "precarious financial situation, particularly vis-à-vis [the Florida Office of Insurance Regulation]")).  Determined to avoid that potential liability, or having to disclose it to the insurance regulators, ATIF entered into non-binding arbitration/mediation with Section 10 with one goal – divest itself of any potential liability.  *See generally* (Doc. #283 at 55 (ATIF's CEO explaining how he had been holding off setting a meeting with the Florida Office of Insurance Regulation in hopes of securing a settlement with Section 10)); (Doc. #288 at 76 (ATIF's CEO providing a "demonstrat[ion] [of] the control of FL OIR over ATIF")).

During the arbitration/mediation, ATIF alerted Section 10 that it could not afford a judgment being entered against it on the not-yet-filed, unripe malicious prosecution claim. (Doc. #296 at 29-30).  So ATIF and Section 10 began working on a solution.  That being,

the *Coblentz* agreement.  (Doc. #290 at 162).  Such an agreement would relieve ATIF from any liability and shift that liability to ATIF's insurers, including Travelers and St. Paul. (Doc. #290 at 162).  Over the next several months, ATIF and Section 10 engaged in extensive discussions and negotiations.  They exchanged several drafts of the *Coblentz* agreement between each other and devised the best method to present a claim to Plaintiffs that would be covered under the policies.  (Doc. #288 at 99-100, 103-118; Doc. #278 at 14).  All of this occurred without Plaintiffs' knowledge or consent.

Several weeks after the settlement negotiations began, ATIF presented Plaintiffs with Section 10's motion for leave to file a third amended counterclaim and proposed complaint for the Malicious Prosecution Action and requested a coverage position for those claims within 10 days.  (Doc. #282 at 45-48).  Unsurprisingly, Plaintiffs inquired as to why ATIF was presenting the motion for a coverage decision two months after it was filed.  (Doc. #282 at 52).  Plaintiffs also inquired as to whether any settlement negotiations were underway and whether ATIF had received a settlement demand.  (Doc. #282 at 51-54).  ATIF responded that it could disclose only that discussions were "ongoing and part of a mediation confidentiality agreement."  (Doc. #282 at 51-54).  ATIF also answered "no" to Plaintiffs' inquiry regarding written settlement demands, despite the fact that several drafts of the settlement agreement had been exchanged between the parties. (Doc. #282 at 51-54).

Plaintiffs continued to inquire regarding ATIF's urgent 10-day deadline and encouraged ATIF to bring it into any settlement negotiations if there is a possibility that any claim would arise, as the motion ATIF provided did not qualify for a coverage decision. (Doc. #282 at 97-100, 118; Doc. #272 at 176 ("Travelers does not issue advisory or

hypothetical opinions.")).   ATIF ignored these requests and continued to collude with Section 10.  (Doc. #282 at 82, 121-129).  ATIF and Section 10 agreed "live" claims were necessary to receive a coverage determination from Plaintiffs.  (Doc. #282 at 127).  So ATIF consented to Section 10 filing its third amended counterclaim in the state court action.  (Doc. #283 at 31-33).  The state court granted the parties' request and allowed the third amended counterclaim.  (Doc. #283 at 31-33).  At the same time, Section 10 filed a separate action for the malicious prosecution claim.  (Doc. #274 at 64-76).  Per the parties' plan, ATIF accepted service of this action without objection.  (Doc. #282 at 130-31).

Armed with "live" claims, ATIF presented the "new" claims to Plaintiffs for a coverage decision.  (Doc. #283 at 11-12, 22-33).  Plaintiffs immediately scheduled a call with ATIF's counsel "to get up to speed on the status of settlement demands overall." (Doc. #283 at 13).  Nevertheless, ATIF continued to withhold information from Plaintiffs about the settlement discussions.  (Doc. #283 at 17).  ATIF also continued to negotiate the *Coblentz* agreement's terms.  (Doc. #283 at 40, 65-82).   A few weeks later, Plaintiffs issued its offer to defend ATIF subject to a reservation of rights.  (Doc. #278 at 180-208; Doc. #283 at 83).  While it appeared ATIF was contemplating Plaintiffs' defense offer, ATIF was actually finalizing the *Coblentz* agreement and working with Section 10 on how to respond to the offer.  (Doc. #283 at 123-252).  Once the agreement was finalized, ATIF rejected the defense offer and proceeded to "execute" the pre-negotiated, finalized *Coblentz* agreement with Section 10 only hours later.  (Doc. #283 at 249-254).

These actions illustrate ATIF's material failure to cooperate.  Instead of providing Plaintiffs with information that could have helped facilitate a resolution, ATIF refused to

answer Plaintiffs' inquiries and provided vague answers. *See, e.g.,* (Doc. #272 at 156). The record shows ATIF was not interested in cooperating with Plaintiffs or providing full disclosure. Instead, it was interested in securing the easiest means of avoiding liability. To do so, ATIF colluded with Section 10 to ensure the parties proceeded in a manner that provided the highest probability Plaintiffs would cover the claims. Those actions resulted in ATIF ignoring its responsibility to cooperate with Plaintiffs in their investigation and handling of the claims.

The record also shows Plaintiffs were substantially prejudiced by ATIF's lack of cooperation. In its quest to avoid liability, ATIF readily agreed to unfavorable settlement terms, including $40 million in damages. Having secured a covenant from Section 10, ATIF never had to worry about the settlement being enforced against it. But ATIF understood that Section 10 would enforce the settlement against Plaintiffs. Nevertheless, ATIF decided it was in its best interest to keep Plaintiffs in the dark about the settlement negotiations. The unfavorable settlement terms and lack of communication/cooperation undoubtedly prejudiced Plaintiffs on a substantial level.

What is more, ATIF acted in this manner despite Plaintiffs' good faith efforts to bring about ATIF's cooperation. From the start, Plaintiffs inquired about settlement negotiations/demands and asked ATIF to keep it apprised of any new developments. *See, e.g.,* (Doc. #282 at 118 ("Travelers' policyholders should keep Travelers advised of developments. If its policyholders believe that this matter may be settled for a reasonable amount and they believe that Travelers may want to participate, I am, as always, willing to listen.")). Moreover, there is no evidence that Plaintiffs failed to comply with any term of the policies in their interactions with ATIF. It is clear Plaintiffs exercised due diligence

and good faith in attempting to secure ATIF's cooperation.  *See Cont'l Cas. Co.*, 283 F. App'x at 692 ("[A]n insurer exercises due diligence and good faith in securing cooperation when it makes efforts to communicate with the insured and specifically instructs the insured to notify it of any developments in the underlying matter.").

Anticipating Plaintiffs might be able to meet all the elements of a cooperation defense, Section 10 posits two arguments in opposition.   Section 10's first argument focuses on the Florida Claims Administration Statute, Fla. Stat. § 627.426.  Section 10 avers Travelers[8] failed to comply with the statute's notice requirement because it failed to send notice, by certified or registered mail, alerting ATIF that it was reserving its rights to assert a cooperation defense within 30 days of when it knew, or should have known, that the defense was available.   By doing so, Section 10 argues, Travelers waived its cooperation defense.  The Court disagrees.

After ATIF submitted the Malicious Prosecution Action complaint to Travelers for a coverage decision, ATIF turned to Section 10 for advice on how much information to share with Travelers regarding the settlement negotiations.   Section 10 insisted that "until Travelers puts in writing that it has coverage, the status of settlement negotiations remains confidential."  (Doc. #238 at 17).   ATIF's counsel expressed concern about withholding information from Travelers and acknowledged a potential cooperation issue – "I think we can insist that Travelers state whether it acknowledges coverages . . . [i]t gets a lot closer on insisting it spell out specific grounds as a condition to sharing

---

[8] This argument applies only to the policy issued by Travelers.  The Florida Claims Administration Statute is inapplicable to the St. Paul policy.  *See Keenan Hopkins Schmidt & Stowell Contractors, Inc. v. Cont'l Cas. Co.*, 653 F. Supp. 2d 1255, 1263 n.1 (M.D. Fla. 2009) ("[U]nder Florida law, the Claims Administration Statute does not apply to excess insurers.").

information (what it will call 'cooperating')." (Doc. #283 at 17); *see also* (Doc. #282 at 87 ("The less information shared, the more coverage problems later – when the insurers complain that they were not provided what they will say would have been adequate disclosure.")).  Moreover, ATIF knew Travelers would likely assert a cooperation defense because Travelers had previously denied coverage for earlier claims from the same litigation and reserved its right to deny coverage on failure-to-cooperate grounds.  (Doc. #272 at 49).  These communications illustrate ATIF had notice that Travelers would assert a cooperation defense once it discovered the extent of ATIF's collusion with Section 10. Such notice is sufficient to satisfy the Claims Administration Statute.  *See Pepper's Steel & Alloys, Inc. v. U.S. Fid. & Guar. Co.*, 668 F. Supp. 1541, 1544 (S.D. Fla. 1987) (finding the insured was "on actual notice of the [insurers'] positions regarding any defense by virtue of their conduct in the pending state court litigation involving similar issues, and had no reason to believe that the [insurers] would do otherwise" for the subsequent claims); *Lazzara Oil Co. v. Columbia Cas. Co.*, 683 F. Supp. 777, 783 (M.D. Fla. 1988), *aff'd sub nom.*, 868 F.2d 1274 (11th Cir. 1989) (finding that the insured's actual notice of the coverage defense satisfied the Claims Administration Statute's notice requirements).

Nevertheless, even if ATIF lacked actual notice before Travelers filed this action, Section 10's argument assumes Travelers knew, or should have known, this coverage defense was available when ATIF submitted its claims for a coverage decision.  The record does not support this assumption.  At the time Travelers sent the reservation of rights letter[9] on September 6, 2013, it had no indication that ATIF would consent to a $40

---

[9] This reservation of rights letter did not mention a cooperation defense, but it did reserve the right to assert any other defenses that might arise in the future.  Moreover, before this letter was sent, Plaintiffs reserved their rights in multiple emails.  (Doc. #272 at 182, 197).

million judgment against it three days later.   Rather, Travelers and ATIF's preceding conversation involved them agreeing on legal counsel for ATIF, assuming Travelers offered to defend subject to a reservation of rights.   After those discussions, but before Travelers made its coverage decision, ATIF filed a motion to dismiss Section 10's claims against it, suggesting that ATIF was standing against Section 10.   Without knowing the extent of ATIF's collusion with Section 10, Travelers did not know, and had no reason to know, it should assert the cooperation defense until the *Coblentz* agreement was executed on September 9, 2016.   Less than ten days later, ATIF received actual notice in the form of Travelers filing this action, alerting it that Travelers would be asserting a cooperation defense.   Therefore, the Court finds Travelers satisfied the statute.   *See Phoenix Ins. Co. v. McCormick*, 542 So. 2d 1030, 1032 (Fla. 2d DCA 1989) ("We do not believe that the [Claims Administration Statute] requires that actual notice be provided exclusively by the described methods. Such an interpretation would lead to a ridiculous conclusion and would require that the legislature intended to elevate pure form over the substance of the problem.").

Section 10's second argument against Plaintiffs' cooperation defense focuses on Florida's Mediation Privilege Statute, Fla. Stat. § 44.405.   Section 10 argues this statute required ATIF to keep all settlement negotiations and discussions confidential, and therefore ATIF did not fail to cooperate by not disclosing those discussions.   The Court disagrees.   ATIF and Section 10 began mediation in May 2013.   It is questionable whether the parties were still in "mediation" during the following four-month period when the *Coblentz* agreement was negotiated and executed.   Most of their communications during that time were via email and phone calls, without any mediator present.   The record shows

the parties were in general settlement discussions and using the "mediation" title as a shield against ATIF's duty to cooperate.

Even if the parties were in mediation, Section 10's interpretation of the mediation privilege is contrary to Florida law. Florida Rule of Civil Procedure 1.720 provides, in pertinent part:

> [A] party is deemed to appear at a mediation conference if the following persons are physically present:
>
> (1) The party or a party representative having full authority to settlement without further consultation; **and**
>
> (2) The party's counsel of record, if any; **and**
>
> **(3) A representative of the insurance carrier for any insured party . . . .**

Fla. R. Civ. P. 1.720 (emphasis added). If, as Section 10 suggests, the mediation privilege bars a party from disclosing mediation communications to its insurer about a potential claim, there would be no need for the Florida Rules of Civil Procedure to require a representative of the insurance carrier to be present at mediation. Clearly, Section 10 misinterprets the privilege.[10]

Based on the foregoing, the undisputed material facts show Plaintiffs did not have a duty to indemnify ATIF. Therefore, Section 10 cannot establish the second element needed to enforce the *Coblentz* agreement. Accordingly, the Court grants summary judgment in Plaintiffs' favor.

---

[10] It also appears Plaintiffs and ATIF shared a "common legal interest" in minimizing ATIF's liability that would allow ATIF to share its settlement negotiations and discussions with Plaintiffs. *See Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-81397-CIV, 2015 WL 1860826, at *8 (S.D. Fla. Apr. 22, 2015). The Court need not address that issue today, however.

**3. Whether the *Coblentz* Agreement was Reasonable and Made in Good Faith**

Turning to the third and final element necessary to enforce the *Coblentz* agreement, Plaintiffs argue that the agreement was neither reasonable nor made in good faith. Plaintiffs highlight that ATIF had the upper hand in the state court litigation and that the $40 million settlement is grossly larger than the $11 million settlement offered during mediation. Plaintiffs also argue that ATIF failed to engage in good faith negotiations to reduce the final settlement amount. The Court agrees in part.

To enforce a *Coblentz* agreement against an insurer, the assignee of the insured must demonstrate, among others, the agreement was both reasonable and made in good faith. These two requirements were "imposed out of the 'real concern in this type of case' that 'the settlement between the claimant and the insured may not actually represent an arm's length determination of the worth of the plaintiff's claim.'" *Jimenez v. Gov't Emps. Ins. Co.*, No. 15-12352, 2016 WL 3058842, at *3 (11th Cir. May 31, 2016) (citing *Steil v. Fla. Physicians' Ins. Reciprocal*, 448 So. 2d 589, 592 (Fla. 2d DCA 1984)). After all, when a covenant not to sue accompanies the consent judgment, "the insured 'has little or nothing to lose because he will never be obligated to pay.'" *Id.* This leads to the possibility that "the settlement of liability and damages may have very little relation to the strength of the plaintiff's claim." *Id.* To prevent a *Coblentz* agreement from being enforced, an insurer need only show that one of the two requirements has not been met.

The first requirement, reasonableness, is determined by "what a reasonably prudent person in the position of the defendant [insurer] would have settled for on the merits of plaintiff's claim." *Id.* (citation omitted). The second requirement, good faith, does not enjoy such a bright line test. An insurer may demonstrate a lack of good faith

"by evidence of a false claim, or collusion in which the plaintiffs agree to share the recovery with the insured, or an absence of any effort to minimize liability." *Id.* (citation omitted). "Courts have found bad faith where, for example, the amount of the settlement was not subject to good faith negotiations." *Id.* (citation omitted).[11]

The Court need not address the reasonableness requirement, because it is clear the *Coblentz* agreement at issue was not made in good faith. ATIF provided the first draft of the *Coblentz* agreement to Section 10 with the damages section left blank. (Doc. #278 at 6). Section 10 revised the draft and returned it to ATIF with $42,680,000 as the damages amount. (Doc. #278 at 14). Despite extensive negotiations over other terms of the agreement during the next several months, the damages amount remained the same. Two days before the agreement was executed, Section 10 reduced the damages from $42,680,000 to $40,000,000. (Doc. #283 at 113). But this reduction was not the result of any negotiation. To be sure, Plaintiffs deposed every one of ATIF's counsel and representatives, and no one recalls negotiating the damages amount of the *Coblentz* agreement. (Doc. #353 at 31, ¶ 60).

Section 10 offers a different narrative, which the record does not support. It avers that "[i]nitial draft agreements called for damages (once prejudgment interest and fee amounts were calculated) of approximately $55 million, which was negotiated to $40 million." (Doc. #385 at 32). Yet Section 10 fails to provide a citation to the record to

---

[11] The Court takes issue with Section 10's misrepresentation of *Monticello Ins. Co. v. City of Miami Beach*, No. 06-20459-CIV, 2008 WL 906537, at *1 (S.D. Fla. Apr. 3, 2008). (Doc. #385 at 30). Section 10 alleges that the court in *Monticello* stated, "whether the settlement agreements were entered into in bad faith is a factual dispute in this case that cannot be resolved at [the summary judgment] stage." A close review of *Monticello* shows that this issue was not decided at the summary judgment stage, but rather at the *motion-to-dismiss stage*. 2008 WL 906537, at *5. It is well settled that different standards of review are employed at the summary judgment and motion to dismiss stages of litigation. Section 10 is reminded that alterations of this nature to fit its positions are improper, disappointing, and will not be tolerated in the future.

support this argument.[12]   Even assuming that early drafts of the *Coblentz* agreement called for prejudgment interest in addition to the $42 million principal, Section 10 fails to illustrate how or when ATIF negotiated for this reduction.  This is not surprising, as the record is devoid of any evidence that ATIF attempted to minimize liability.  Instead, having secured a covenant from Section 10 that the judgment would not be enforced against it, ATIF readily agreed to any damages amount that Section 10 presented.

Based on the foregoing, the undisputed material facts show ATIF failed to make any effort to minimize liability, and therefore the *Coblentz* agreement was not made in good faith.  Because Section 10 cannot satisfy the third element needed to enforce the *Coblentz* agreement, the Court grants summary judgment in Plaintiffs' favor.

Accordingly, it is now

**ORDERED:**

1. Plaintiffs Travelers Indemnity Company of Connecticut and St. Paul Fire & Marine Insurance Company's Motion for Final Summary Judgment (Doc. #353) is **GRANTED**.

2. Defendant Section 10 Joint Venture, LLP's Corrected Motion for Summary Judgment (Doc. #368), in which Defendants Sky Property Venture, LLC, CAS Group, Inc., Attorneys' Title Insurance Fund, Inc., and Florida Title Co. joined, is **DENIED as moot**.

3. The Clerk is directed to **ENTER JUDGMENT** in favor of Plaintiffs Travelers Indemnity Company of Connecticut and St. Paul Fire & Marine Insurance

---

[12] "District court judges are not required to ferret out delectable facts buried in a massive record[.]"  *Chavez v. Sec'y Florida Dep't of Corr.,* 647 F.3d 1057, 1061 (11th Cir. 2011).

Company on the declaratory relief claim (Doc. #37) and **DISMISS** Defendants Section 10 Joint Venture, LLP, Sky Property Venture, LLC, and CAS Group, Inc.'s counterclaims (Doc. #50) **with prejudice.**

4. The Clerk is further directed to **TERMINATE** any pending motions or deadlines and **CLOSE** this action.

**DONE** and **ORDERED** in Fort Myers, Florida, this 7th day of July, 2016.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record